Clarence E. Baldwin v. Commissioner.
Baldwin v. Commissioner
Docket No. 45001.
United States Tax Court
T.C. Memo 1955-200; 1955 Tax Ct. Memo LEXIS 135; 14 T.C.M. (CCH) 794; T.C.M. (RIA) 55200; July 21, 1955
*135 1. Amount of unreported income of petitioner in each of the years 1948 through 1951 determined. 2. Propriety of certain deductions claimed in various of the years 1948 through 1951 determined. 3. Held: Some part of the deficiency in each of the years 1948 through 1951 was due to fraud with intent to evade tax. Edward J. O'Connor, Esq., and William T. Choisser, Esq., for the petitioner. Joseph G. White, Jr., Esq., and Earl C. Crouter, Esq., for the respondent. VAN FOSSAN Memorandum Findings of Fact and Opinion Respondent determined deficiencies in income tax of petitioner for years and in amounts as follows: Year
Deficiency
1948
$49,779.40
1949
20,383.77
1950
26,265.17
1951
36,730.35
As a result of a series of amended pleadings, including an amendment thereof to conform to proof, respondent has proposed to reduce and increase the deficiencies and now asserts additions thereto for fraud and substantial underestimation of estimated tax, as follows: Addition
to Tax for
Substantial
Addition
Underestima-
Taxable
to Tax
tion of Esti-
Year
Deficiency
for Fraud
mated Tax
1948
$18,565.98
$ 9,282.99
$1,237.70
1949
20,461.10
10,230.55
1,005.17
1950
34,937.02
17,468.51
1951
25,115.70
12,557.85
1,457.86
*137 Findings of Fact The partial stipulation of facts filed by the parties, with exhibits attached, is adopted, and, by this reference, made a part hereof. The petitioner is Clarence E. Baldwin, sometimes known as "Teak" Baldwin, who filed his income tax returns for the years here involved with the collector of internal revenue for the district of Arizona, at Phoenix. He computed and reported his income by calendar years on a cash receipts and disbursements basis except as to inventories and certain items of interest. During the period under review, petitioner owned and operated in Phoenix a night club known as the Gilded Cage, and a restaurant and bar known as "Steak House". Petitioner employed a certified public accountant to maintain his general ledger and cash journals and to prepare his income tax returns. The accountant derived his information with regard to sales from a daily record kept by Charles Briley, manager of the Gilded Cage. This record consisted of total sales of the day, per cash register tapes, less petty cash disbursements, with the net amount covered by bank deposit slips. Briley prepared the bank deposit and the deposit tickets for the bank accounts of the *138 business until the latter part of 1950, when he left the petitioner's employment. Upon the closing of the Steak House for the night, some one, usually the bartender-cashier, would remove from the cash registers all cash and bank checks, together with the cash register tapes and sales slips, and deliver them in bags to Briley or the petitioner at the Gilded Cage. Usually, the following morning, Briley would empty the bags, count the cash, compare the cash and bank checks with the sums recorded on the register tapes, deposit no more than the amounts recorded on the register tapes, and place the excess, consisting of the cash used to begin the day's business, plus the unregistered receipts, in a fund kept in a compartment of a combination safe at the Gilded Cage. Briley followed the same procedure with the cash and bank checks in the cash registers at the Gilded Cage. The cash fund in which this excess was placed was not shown on the books of account; the only cash accounts shown were the cash on deposit in bank accounts. A minimum of $4,000 was customarily kept in this cash fund, approximately $1,000 of which was used to supply the cash registers at both the Steak House and Gilded *139 Cage with sufficient cash to begin the day's business. On various occasions, sometimes in the presence of Briley, petitioner removed and kept for his own personal use portions of the amount of the cash fund in excess of $4,000. Sometimes he would have Briley make the removal for him. Neither the sums placed in this fund nor those removed therefrom were ever recorded on the books of account. The safe in which the $4,000 fund was kept had a separate compartment with a key lock, the key to which was kept by the petitioner only. In this compartment petitioner maintained a separate fund in large denominations of cash ranging from $50 to $500 bills. This separate fund totaled approximately $25,000 to $30,000 most of the time during the period in question. The day to day excess funds in the cash registers and the funds in the safe were built up by the failure to "ring up" or record on the cash registers all cash or bank checks received in payment of sales and placed therein. Some bank checks received in payment of sales were not placed in the register. Sometimes they would go directly to the cash in the safe or would be retained by the petitioner; sometimes they would be commingled with *140 the cash and bank checks to be deposited in the business bank accounts, and a like amount of cash would be removed therefrom and placed in the safe or retained by petitioner. Such practice was often followed with such bank checks as those received in payment of large bills, or those received in payment of bills at parties that did not end until after the usual closing time. Still another practice was sometimes followed with bank checks. The petitioner deposited only that part of a bank check which was received in payment of the customer's monthly bill, and the remaining part, which represented a tip for the waiter, the petitioner retained and did not pay over to the waiter. At other times the proceeds from sales to employees were not registered or recorded and were not placed in the cash register. Petitioner reported as his total sales at the Steak House and Gilded Cage the sum of $277,818.50 for 1948, $278,917.29 for 1949, $204,775.03 for 1950; and for 1951, $153,610.41 as total sales at the Steak House. Petitioner filed a partnership return of income (Form 1065) for the fiscal years ended August 31, 1947, 1948 and 1949, in the name of the partnership or joint venture between himself *141 and Briley. The partnership return for the fiscal year ended August 31, 1947, showed gambling income (winnings less losses) of $9,297 and showed 50 per cent distribution to each of the alleged partners, Baldwin and Briley. The partnership return for the fiscal year ended August 31, 1948, showed gambling income (winnings less losses) of $3,272.85 and showed 50 per cent distribution to each of the alleged partners. The petitioner reported his 50 per cent distribution in his 1948 individual income tax return as income from "Baldwin & Briley Px" and indicated it was gambling gain. The partnership return for the fiscal year ended August 31, 1949, showed no income and bore the statement "Not Operating During This Fiscal Period". No partnership or joint venture ever actually existed between petitioner and Briley. the petitioner as a means of accounting in part for unreported income, for the years prior to those in question, determined by the net worth method of reconstructing income. In order to account to the Commissioner of Internal Revenue for $10,000 of unexplained increase in net worth in these prior years, the petitioner represented that he had borrowed the sum of $10,000 from this *142 alleged partnership. As a step in this scheme, the petitioner signed a document purporting to be a partnership or joint venture agreement with Briley. This document was prepared and signed sometime in 1947 and back-dated to August 20, 1946. In addition to operating restaurant and night club businesses at the Steak House and Gilded Cage, the petitioner participated in gambling games and related activities for money at these places of business in the public rooms, his private office, or in small nearby buildings on the premises and at divers places outside of Phoenix. The games were played with dice, cards, or devices sometimes found on bars known as a "put and take" top or "horses". The dice and card games were such games as poker, black jack, the usual type of dice game or a dice game known as "Ship, Captain and Crew." The petitioner gambled with individuals who frequented the Steak House and Gilded Cage without being solicited or invited; and, in addition, petitioner, at times, inveigled business people into the gambling games by inviting them to the Steak House or Gilded Cage or other appointed place on the pretext of discussing some business matter, such as the purchase of real *143 estate or real estate construction. Upon arrival these people would be invited to drink an alcoholic beverage and then to participate in a gambling game. Some of the individuals who participated in these games with the petitioner became intoxicated and stupefied by the alcohol or other intoxicating agent in their drink and petitioner would win or cheat from them all their cash and then have them draw bank checks for additional sums. In his 1948 individual return, the petitioner reported no individual gambling gain, and reported as his share of the gambling gain or income from the alleged Baldwin and Briley partnership the sum of $1,636.43 from which he subtracted $141 as his individual gambling loss. The partnership return for the alleged partnership reported only a net figure of $3,272.85 described as "Winnings less losses", one-half of which or $1,636.43 is reported as the petitioner's share. On or about September 29 or 30, 1948, petitioner engaged in a gambling game with one George Emmett and another individual. On this occasion, Emmett lost approximately $4,200. Emmett's check dated September 30, 1948, made payable to petitioner in the amount of $3,150, was endorsed by petitioner *144 and cashed by the Valley National Bank, Phoenix, Arizona, on September 30, 1948. On or about September 24 and 25, 1948, Theodore Fanning, after engaging in a dice game with other individuals, proceeded, in the company of one of the individuals, to the Gilded Cage. Prior to his arrival at the Gilded Cage, Fanning cashed two checks totaling $600 at a bonding concern known as the Paymaster. While at the Gilded Cage, he issued five checks, the proceeds of which were not received by him but, together with the cash previously obtained, were expended for drinks for the house, for an after-hours floor show, for gratuities to the individual performers appearing in the show and in a dice game with Briley in which petitioner occasionally participated. The checks drawn by Fanning at the Gilded Cage that were subsequently cashed and charged to his account on September 25 and 27, 1948, aggregated $2,200. In settlement of Fanning's claim that his checks had been raised, $1,000 was repaid. An account entitled "Gambling" maintained in petitioner's general ledger records an entry of September 30, 1948, showing a gain in the amount of $3,065. A deposit in the Steak House bank account in the amount *145 of $3,065 was made on September 28, 1948. Petitioner's gambling account shows a net loss of $141 for the year 1948. For the year 1949, this account has one entry dated July 31 showing a gain of $254 which is offset by a loss of $294. In his individual return for 1949, petitioner reported no gains or winnings from his gambling or related activities. In March, 1949, petitioner engaged in certain gambling games with one Gordon T. Stark in which the former won approximately $10,000 from the latter. In his 1950 individual income tax return, petitioner reported $12,878.48 as "gambling gain", which amount is shown in petitioner's "gambling" account as net gain for the year after total losses of $11,066.71 are subtracted from total winnings of $23,945.19. The sum of $12,878.48 is reduced to $12,690.67 by subtraction of $187.81 designated as "Stable Loss". The latter amount was derived from an account in petitioner's general ledger entitled "Racing Stable", which shows winnings of $1,086.31 and expenses of $1,274.12. On or about March 31, 1950, petitioner won approximately $830 from Dr. E. Payne Palmer in a "Put and Take Top" game. In a dice game which took place on or about April 11, 1950, and *146 in which petitioner, one Charles Greenbaum and a "Bud" Lindeman participated, Greenbaum lost approximately $1,500, $1,000 of which was won by petitioner. In a dice game on or about May 24, 1950, in which petitioner, Jack McElroy, and Clifford W. Waddoups participated, the latter lost the sum of $3,750, $500 of which was paid to petitioner on the following day to repay a loan of that amount which petitioner informed Waddoups was lost in the game. Also on the following day, petitioner informed Waddoups that he, Waddoups, had lost the sum of $3,250 to McElroy whereupon Waddoups issued a check therefor. McElroy never spoke to Waddoups with respect to the loss or the check. Waddoups was intoxicated during the game and his mental faculties were foggy. Subsequently, on October 12, 1950, Waddoups engaged in a dice game with petitioner at the Steak House in which game Waddoups was again the loser. On the following morning, October 13, 1950, Waddoups settled the amount of his losses for $1,000. Petitioner's ledger account shows gambling gains for May, 1950, in the amount of $10,796.56. On June 20, 1950, George W. Hinton played "Black Jack" with petitioner and three others. Hinton's losses *147 were paid by check. A check for $187 was issued to cash and given to petitioner who handed it to Briley. Briley, in turn, gave petitioner the cash therefor out of the safe. Thereafter on June 28, 1950, Hinton again played "Black Jack" with petitioner and the same three others. On this occasion, petitioner was banker in the game. Hinton gave three checks to petitioner amounting to $200, $400 and $800, respectively, in payment of losses. In addition, Hinton issued two checks to one of the other participants which checks he later took up with cash. Hinton also took up additional checks from petitioner with cash, which checks totaled between $2,000 and $3,500. On or about June 29 or 30, 1950, Cecil L. L. Drew lost approximately $450 in a game of "horses" at the Steak House, in which game petitioner and other individuals participated. Drew's checks in a total amount of $450 were subsequently cashed by petitioner at Drew's bank in Mesa, Arizona. An entry of June 30, 1950, in petitioner's "Gambling" account shows his total gambling gains for such month as $3,020. In or about July, 1950, Woodson D. Upshaw lost approximately $1,500 in a dice game in which he, petitioner, and occasionally *148 another, participated. He paid his losses by two checks in the amounts of $600 and $900, respectively. Petitioner's gambling account records a gain of $900 for the month of July, 1950. At La Jolla, California, on September 8, 1950, Edwin E. Warwick lost approximately $4,800 in gambling games and related activities in which he, petitioner and another party participated. Petitioner's gain, after giving the other participant $1,000 for one of his checks, was at least $2,300. Warwick's check to cash dated September 8, 1950, and in the amount of $3,000, was endorsed and cashed by petitioner at the Security Trust & Savings Bank, La Jolla, California. On this occasion, the three also attended the races where petitioner bet on some horses. When he returned home, petitioner computed his gain, after payment of hotel expenses, as $800, which amount was recorded in his "Gambling" account for September, 1950. For August and September, 1950, petitioner's books record a net gain from gambling of $2,913. On October 7 and December 12, 1950, Dauras Horrall lost $596 gambling with petitioner. This amount was paid by making a credit on a plumbing bill owed Horrall by petitioner, and no record was *149 made of it. In April, 1951, at Yuma, Arizona, Seke Musgrove lost at least $3,300 playing Black Jack with petitioner and two other persons. One person named Hubbard and Musgrove were in the game at all times while petitioner and the other party played only occasionally. On this occasion, petitioner from time to time borrowed from Musgrove to cover his losses. Hubbard won all the money. Prior to this occasion in October, 1948, Musgrove issued a check to petitioner in the amount of $700 to be bet on a horse which lost. The check was never cashed because of an irregular signature, and Musgrove made it good. On or about March 27 or 28, 1951, A. W. Wilson lost at least $1,820 in a dice game in which he and petitioner participated. On this occasion, Wilson issued three checks in amounts of $320, $500 and $1,000, all of which were paid to petitioner. The $1,000 check was undated, held, and not cashed until July 19, 1951. In addition to the foregoing amounts, Wilson also lost approximately $125 cash which he had in his pocket at the time he began shooting dice with petitioner. On May 27, 1951, in a house adjoining the Steak House, A. R. Evans, a real estate broker, played stud poker with *150 petitioner and two others. Petitioner was banker in the game. Immediately prior to the game, Evans drank two alcoholic drinks prepared for him by petitioner, and, shortly after the game began, Evans lapsed into a stupor. Sometime later, Evans was aroused from this stupor and informed that he owed petitioner $2,000 and the others $300 and $400. Evans protested but finally agreed to pay the $2,700. He thereupon gave petitioner a check drawn to cash in the amount of $2,000. Upon being informed by petitioner that he would probably have trouble cashing such check and at petitioner's request, Evans issued two $1,000 checks in place thereof. Again Evans was requested to draw checks in a smaller amount and once more Evans complied by drawing two in the sum of $500 each. Although the smaller checks were supposed to be in substitution of the larger ones and the latter destroyed, all of the checks were subsequently cashed by Evans' bank and charged to his account. Two other checks for $300 and $400, respectively, were issued by Evans on this occasion. Both checks were used to purchase liquor at retail package stores in which Evans had an interest. The gambling account maintained on petitioner's *151 general ledger records gambling gains and offsetting losses for the years 1948 through 1951, as follows: Gains
Losses
1948
$ 4,465.00
$ 4,606.00
1949
254.00
294.00
1950
23,945.19
11,066.71
1951
9,125.00
9,448.38
Respondent would disallow all of the above offsetting losses for lack of substantiation. [1]
During the years in question, petitioner owned some race horses from which he derived income in the form of winner's purses. Respondent has determined that income so derived by petitioner was as follows: 1948
$1,315
1949
1,315
1950
122
1951
10
Petitioner rented the Gilded Cage in 1950 for a period of two months and nine days. In his 1950 return, petitioner reported $1,503 rental income from "2950r N. Central", the address of the Gilded Cage. On or about September 13, 1950, the petitioner sold the Gilded Cage and received from the *152 purchasers the sum of $2,441.47 in payment for the portion of liquor inventory sold to them. The petitioner did not record or report in his return the sale of this inventory. The check received by petitioner in the transaction was endorsed by him to Ritter-Walker Distributing Company to pay a bill owing such company in the amount of $2,073.80. The balance of $367.67 was credited to Steak House "purchases". The portion of the inventory not so sold was removed to the Steak House. In his 1951 return, petitioner reported as income from interest "Russell's Gilded Cage $543.34". No other item of interest income was reported. Petitioner, in 1951, received $35.40 interest on his savings account in the First National Bank of Arizona, Virginia Branch, which interest was not reported. In 1951, also, petitioner received $36.83 interest income on the sale of certain real estate known as the Ingleside lots, which income was not reported. Automobiles of customers at the Steak House were parked by one Harry D. Gilbert, an attendant, who was not an employee of the petitioner and whose sole compensation was the tips received from the customers. Prior to the years here involved while petitioner was *153 in the Armed Service, Gilbert entered into an arrangement with the wartime management of the Steak House, which was acquiesced in by the petitioner upon his return, whereby Gilbert was listed as an employee on the records submitted to Federal and State governmental agencies administering social security and insurance plans. Pursuant to this arrangement, Gilbert throughout the years here involved drew a weekly or monthly check from the Steak House. The amount of the check and any amounts withheld were recorded on the books of account like the other employees and deducted as wage expense. Except for three of these checks, each in the amount of $24, at least one of which was received by Gilbert prior to the taxable years, all were endorsed by Gilbert and returned, usually to the bartender at the Steak House. These checks would then go to Briley along with the daily collection from the Steak House as an overage in cash. Such practice was continued throughout the period involved and petitioner's accountant was not informed thereof until sometime in 1950 or 1951, when some of the checks included in the bank deposits came to his attention. Occasionally, such checks were credited to an expense *154 account or purchases at the direction of petitioner. During the first part of the period under review, these checks were issued weekly in the amount of $24; thereafter they were issued monthly in the amount of $100. For the years 1948 through 1951, the petitioner claimed an expense deduction for alleged wages in the amount of $3,919.50, $4,522.50, $5,025, $5,408, respectively, paid to his wife, Kaytie Brewington Baldwin (hereinafter called Kaytie). During these years, the petitioner's wife was not listed on the time book or record of employees. She reported to no one and kept no regular hours at any of his places of business. Kaytie came into the Steak House at various times when she deemed it necessary and sometimes assisted the regular full-time hostess escort customers to their tables when the amount of business required it. She sometimes visited with her personal friends. She was responsible for the design and color schemes carried out in the decoration of the Steak House. The full-time hostess who was employed during all of the years in question was paid less than the amounts paid Kaytie. Petitioner would usually bring the checks issued to Kaytie home to be endorsed by her. *155 She would then give them back to petitioner to be deposited for her in her personal account. Part of the amounts thus paid Kaytie were used by her to buy clothes for herself and her daughter and for household expenses. For 1949, petitioner claimed a $722.63 abandonment loss on a shuffleboard which had been used as an amusement device for customers at the Steak House while waiting to be seated. The shuffleboard device was given to a friend for hauling it away. The friend subsequently gave it to the YMCA in Phoenix. For each of the years 1949 and 1950, the petitioner claimed a $600 "promotion" expense deduction. For each of the years 1949 through 1951 the petitioner claimed a deduction in the amount of $6,536.22, which he described in his returns as the interest on the income taxes and penalties totaling $108,937.38 for the taxable years 1940 through 1946 which the United States Government was proposing to assess against him; and in a concluding sentence stated that since he was on the accrual basis, he was taking this $6,536.22 as a deduction. It was not until after the years here in question that the petitioner's income tax liability for the taxable years 1940 through 1946 was *156 settled for an amount less than that determined, and additional tax was assessed. In his 1949 individual return the petitioner deducted the sum of $2,014.82 as repairs and moving expenses. This sum represented the cost incurred in moving a dwelling, from which the petitioner received rental income, from one location to another. In his 1950 individual return the petitioner deducted as a Steak House expense the sum of $9,514.41 referred to as repairs. Of the total $9,514.41, $4,831.55 represented the cost of new carpeting and the construction of an additional room at the Steak House. Prior to the years involved, at the time the Gilded Cage was built, petitioner paid for putting in a pavement out to the street in front of the building. The cost to petitioner was $2,388, which included the installation of a meter box and 27 1/2 feet of 20 inch concrete pipe. At the same time, petitioner had certain additional work done relating to the landscaping of the property at a cost of $254.76. A portion of this work was on county property. In 1948 when the area was incorporated into the city of Phoenix, the road was widened and the city pavement was laid over the top of the old pavement and *157 new pavement was laid along the sides. In his 1948 individual return, petitioner deducted as a business expense the sum of $4,442.01 designated as a "Loss (Abandonment)". Such sum includes approximately two-thirds of the cost of the pavement previously put in by petitioner, or $1,761.84. In his individual returns for the years 1949 through 1951, petitioner claimed deductions for depreciation, as follows: 1949
1950
1951
Steak House ac-
count
$ 4,277.93
$5,819.24
$ 7,729.70
Rental account
299.57
659.60
Gilded Cage ac-
count
5,912.99
2,744.29
3,502.39
$10,490.49
$9,223.13
$11,232.09
On December 1, 1951, the petitioner agreed to sell to his attorney in Phoenix his one-half interest in a race track bar known as "The Paddock" and liquor license which they then owned as equal partners. In part payment for his one-half interest, the petitioner received a $5,000 credit in December, 1951, for legal fees and expenses owing to the attorney. The partnership interest was transferred subsequent to 1951 after the close of the 1952 spring racing season, as provided in the agreement entered into by the parties. In 1951, the legal fees owing by the petitioner *158 to the attorney were in excess of $5,000, and the credit was in part payment thereof. The fees were for legal services rendered, such as defending the petitioner in an assault and battery suit; a suit in which the plaintiff sued the petitioner for compensatory and punitive damages for defrauding him of monies, for assault and battery and for false imprisonment; for preparing wills and trusts for the petitioner; and for advising the petitioner upon the sale of certain assets. No allocation was made of the amount of the total fees relating to any of the services rendered, nor was the $5,000 credit allocated to any year or particular service or services rendered. The petitioner claimed $5,000 as a business expense deduction in 1951 for legal expenses. In his 1951 return the petitioner reported a long-term capital gain in 1951 of $2,512.44 (50% of $5,024.89) on the sale of his partnership interest in "the Paddock." The petitioner also reported a long-term capital loss in 1951 of $259.45 (50% of $518.90) on the sale or disposition of a Chevrolet automobile which loss he deducted from the $2,512.44 reported as long term capital gain, leaving a net long term capital gain of $2,252.99. *159 In his 1949 individual return the petitioner deducted as non-business expenses the following sums with the following identifications: Interest - Ingleside Lot Contract
$ 551.84
Taxes - State Income
594.24
Residence
1,317.24 Included in the foregoing amount of $551.84, identified as interest, is the sum of $354.17, which represented accrued interest due and which was paid by petitioner at the time of his purchase of the real estate referred to as Ingleside lots. The sum of $1,317.24, identified as residence taxes, was paid by petitioner to redeem his residence from Calvert B. Hicks, who had paid petitioner's delinquent Arizona real estate taxes and was starting proceedings to take possession. Petitioner's check, dated March 17, 1949, was drawn to the order of Hicks and his attorney, Joseph Jenckes, Jr. In February, 1948, petitioner gave his mother $1,000 to be used in defraying the living expenses of herself and his stepfather. At that time, the mother and stepfather were paying $20 per month rent. In 1948, petitioner's mother had at least $10,000 in bank accounts which sum represented her savings and the proceeds of an inheritance. In September, 1948, she transferred *160 approximately $5,000 of her funds to petitioner as a loan, and at approximately the same time purchased a home for herself and her husband entirely with her own funds. The two lived in petitioner's house in Phoenix for a part of November and all of December, 1948. On his 1948 return, petitioner claimed his mother and stepfather as dependents. The sums declared and paid by the petitioner as his estimated tax for the taxable years 1948, 1949 and 1951 were $4,386.42, $3,970.22 and $818, respectively. Some part of the deficiency in each of the years 1948 through 1951 was due to fraud with intent to evade tax. Opinion VAN FOSSAN, Judge: There are approximately 26 groups of items in controversy in this proceeding. The first is whether petitioner's receipts from the Steak House and the Gilded Cage were understated in each of the taxable years before us. This question is entirely one of fact as to which the burden of proof rests with petitioner. It is respondent's position that the receipts of the Steak House and Gilded Cage were understated by petitioner for each of the years 1948 through 1951 by at least $10,400, $15,208.25, $11,545.56 and $14,174.90, respectively. Petitioner's *161 contention is that all of the receipts from these sources are included in his books and records from which the amounts reported in his tax returns were taken and that respondent has offered no evidence showing otherwise. We disagree with petitioner. The argument advanced is based entirely upon petitioner's own self-serving testimony which the facts found on this record show does not give the true picture. While it be true that the amounts reported apparently agree with those recorded in petitioner's books of account, the facts clearly show that the entries therein were taken from those appearing in a daily record maintained by Briley, which entries, as well as bank deposits, were made to coincide with the daily cash register tapes; that certain receipts in sizable amounts were not recorded on such tapes and were treated as an overage in cash; and that all such overages were added to a fund kept in petitioner's safe at the Gilded Cage, to which fund petitioner alone had access. This is true at least as to the years that Briley was in petitioner's employ and the evidence does not show that this systematic practice of not recording and not reporting all receipts did not continue for *162 the remainder of the period in controversy. The record justifies no other conclusion than that reached by respondent. Therefore as to this item, respondent is sustained. The next item involves the status taxwise of an alleged partnership between petitioner and Briley. Respondent has refused to recognize the existence of such a partnership and maintains that the income reported on the 1948 partnership return filed in the name thereof belongs solely and entirely to petitioner. The evidence adduced herein affirmatively shows that no bona fide partnership ever existed between petitioner and Briley within the meaning of the tax statutes, cf. Commissioner v. Culbertson, 337 U.S. 783, and that the so-called partnership agreement was but a fiction and a sham, drafted, filed, and back-dated solely for the purpose of affording petitioner an explanation for a $10,000 increase in his net worth in years prior to those before us, which years were then under investigation by respondent. We, therefore, affirm respondent's determination on this point. The next issue involves a determination of the amounts derived by petitioner in each of the years in dispute, from his gambling *163 and related activities. Specifically, the question is whether petitioner's receipts from these sources were fully recorded on his books of account and reported in his tax returns for such years. Petitioner contends that all such receipts were so recorded and reported. Respondent maintains that petitioner's income from gambling was understated in each of the years by at least $6,383, $10,254, $18,018, and $11,660, respectively. The issue thus presented is clearly factual and for each year, except 1949, the burden of proving respondent to be in error is entirely on petitioner. With respect to the year 1949, the respondent, in his amended pleadings, asserts that petitioner realized unreported receipts from gambling in that year in the sum of $960 over that set forth in respondent's bills of particulars. The addition to income of such amount would result in an increased deficiency over that originally determined by respondent and from which this proceeding arises. Thus, as to this one item, respondent has the burden of proof. Respondent's position as to the year 1948 is based upon his argument *164 that in that year petitioner, as a result of fraudulent activities in connection with his gambling, procured from George Emmett at least $3,150 by check and $1,033 in cash, and $2,200 in cash and checks from Theodore Fanning. On the occasion of the Emmett incident, petitioner admits having been a winner and points to the $3,065 entry of September 30, 1948, in his gambling account as having recorded such gain. Petitioner further maintains that the Emmett check for $3,150 dated September 30, 1948, was deposited in the bank on September 30, 1948, and that he thereupon drew two checks for $1,000 each to pay off the other winners in the game. The fact is that the deposit to which the $3,065 entry relates was made on September 28, 1948, or one day before the Emmett affair took place. Furthermore, the evidence is quite definite that there was only one other individual in the game with the petitioner and Emmett and that he was neither of the persons to whom the petitioner's checks were made payable. Thus it is that the aforementioned entry in petitioner's gambling account has no reference to and does not record the receipt by him of the Emmett check. Moreover, it appears highly doubtful *165 that the foregoing checks for $1,000 each were payoffs in or related in any other manner to the activity in which Emmett was involved. As to the remaining $1,033 which respondent claims was procured from Emmett at the same time, the record does not justify the conclusion that such amount was necessarily received by the petitioner. A third party was a participant in the activities in which petitioner and Emmett engaged and for aught that appears may have been the winner of the amount in question. Turning to the Fanning incident, the facts show that Fanning, after having indulged in a round of drinking and dice with certain individuals on the afternoon and evening of September 24, 1948, proceeded, in the company of one of these individuals, to the Gilded Cage where he met petitioner. It appears that while he was at the Gilded Cage, Fanning bought drinks for the house, paid for an after-hours floor show, gave gratuities to the individual performers appearing in the show and lost some money in a dice game with Briley in which game petitioner only occasionally participated. Checks issued by Fanning while at the Gilded Cage and used to finance in part the foregoing were subsequently *166 cashed and charged to his account in the amount of $2,200. Whether, as claimed by Fanning, his checks had been raised does not, for the moment, concern us. In this connection, what interests us is that, upon Fanning's charge that such irregularities had, indeed, occurred, $1,000 was refunded. The record made affords no basis for the conclusion that the remaining $1,200 or any part thereof was received by petitioner as a result of his gambling activities with Fanning. We, therefore, hold that in the year 1948 petitioner received additional unreported income from his gambling and related activities in the amount of $3,125. Respondent's contention as regards the year 1949 is that petitioner had unreported income from gambling in the amount of $10,254. The amount of $254 appears in petitioner's gambling account as a gain realized in 1949. However, no gain was reported inasmuch as offsetting losses of $294 are recorded for such year. By disallowing these losses, respondent would add the $254 back into income. The propriety of such disallowance is determined infra as a part of a subsequent issue. For now, all that need be said in this respect is that petitioner, in fact, realized this *167 amount. As for the $10,000, the evidence shows that Stark lost approximately this sum gambling solely with petitioner and that such losses were not reflected as gains on petitioner's books of account. We, therefore, hold that petitioner realized unreported gambling gains in 1949 in an aggregate amount of $10,254. For the year 1950, petitioner's gambling account records aggregate gains of $23,945.19 with offsetting losses in the sum of $11,066.71. Respondent insists that petitioner realized at least $18,018 which was not recorded in his books or reported in his tax returns. According to respondent, such amount was received by petitioner as a result of various gambling transactions with approximately seven individuals. On a number of occasions, however, petitioner was but one participant in a game having several participants. In some of the games, petitioner was the banker. Considering these facts, together with all others bearing upon the transactions in question and with due regard to all the inferences properly to be drawn, we have determined that petitioner realized unrecorded and unreported gambling gains in the amount of $3,363. We accordingly so hold. Respondent's position *168 with regard to the year 1951 is based upon three incidents which took place in that year and involved Musgrove, Wilson and Evans, respectively. We cannot agree that petitioner realized any gain on the occasion when he gambled with Musgrove. To the contrary, the facts bearing on this point indicate that petitioner was himself a loser, and that another participant was the only winner. That there was collusion between such person and petitioner, as hinted by respondent, lacks support in the evidence. However, on the occasion of the Wilson incident, the record is clear that petitioner realized a gain of at least $1,945, which gain was not recorded in his gambling account. Moreover, the evidence is equally clear that as a result of the transactions involving Evans, petitioner fraudulently acquired at least $5,000, the receipt of which was neither recorded nor reported. In view of the foregoing, therefore, we hold that petitioner's income from gambling and related activities in 1951 was understated by at least $6,945. The next issue involves respondent's disallowance of alleged gambling losses in each of the years 1948 through 1951. For such years, petitioner's books of account show gambling *169 losses incurred in the amounts of $4,606, $294, $11,066.71 and $9,448.38, respectively. Respondent would disallow all such losses as being unsubstantiated. [2]
Petitioner points to the ledger sheets containing his "gambling" account for each of the years, which sheets are in evidence, and argues that the gambling losses in controversy are established thereby. We do not entirely agree. Respondent has adduced evidence tending to show that the entries made in petitioner's gambling account were based upon petitioner's representations, sometimes oral, sometimes written, on small scraps of paper, to his accountant. That some of these representations were merely estimates and on occasion reflected personal expenses not properly classified as gambling losses is quite *170 clear. Moreover, such account does not show in any year such pertinent data as the name of the person from whom or to whom money was won or lost. Nor were the dates of any particular activities given. Finally, petitioner has testified that the figures entered as winnings or losses were arrived at by ascertaining the amount he had in his pocket at the outset and comparing that with the sum he retained at the close of any particular trip or activity with the difference representing a gain or loss. Such an incomplete and inaccurate record does not establish the gambling losses in controversy. Cf. Puritan Church of America v. Commissioner, 209 Fed. (2d) 306, affirming memorandum opinion of this Court [10 TCM 485], certiorari denied, 347 U.S. 975. That is not to say, however, that petitioner sustained none of the gambling losses claimed during the years in dispute. Because of the nature of the activity, we feel it reasonable to assume that petitioner incurred some losses therefrom as recorded in each taxable year. Thus we have determined that such losses amounted to $2,000 for 1948, $150 for 1949, $7,000 for 1950 and $4,500 for 1951. Cohan v. Commissioner, 39 Fed. (2d) 540. *171 The next item in dispute involves the propriety of respondent's determination that petitioner understated his income from race horse purses in each of the taxable years by at least $1,315, $1,315, $122 and $10, respectively. Respondent maintains that petitioner received the foregoing amounts from purses won by a horse name "Ten Thirty". In this respect, it appears that the horse in question was purchased with petitioner's funds, was trained by and sometimes raced in the name of petitioner's brother-in-law, and at other times in the name of an employee of petitioner. It further appears that the horse was sometimes stabled by petitioner. Petitioner agrees that he received some of the winnings of the horse but petitioner strongly denies ownership thereof. It is petitioner's theory that he loaned the purchase price to his brother-in-law and that whatever portion of the winnings were received by him was in payment of that loan. Petitioner's denial stands on the record unsubstantiated by any documentary proof or by the testimony of the brother-in-law who, petitioner alleges, was the owner. *172 Absent a satisfactory explanation, it is ordinarily to be assumed that evidence from such person, if produced, would be detrimental to petitioner's case. Moreover, the evidence on the record shows that on at least one occasion petitioner was in possession of the check representing the winnings and presented it to his employee, to whom it was drawn, for endorsement. Finally, in his own testimony, petitioner states that the person in whose name a horse is registered or raced is not always the true owner. On all the evidence bearing on this point, we have concluded and accordingly hold that respondent did not err in his determination with respect thereto. The next issue is whether petitioner failed to report all the income derived by him in 1950 from the rental of the Gilded Cage. Respondent has determined and here argues that such income was understated by the amount of $300. The facts found with regard to this item show that petitioner rented the Gilded Cage in 1950 for a period of two months and nine days. Petitioner's tax return for 1950 contains an item showing rental income derived from "2950r N. Central". At one place in his testimony, petitioner stated that certain rooms *173 in a structure located at the rear of the Gilded Cage were used as accommodations for and rented to members of the floor show appearing at the Gilded Cage. Thus, while 2950 N. Central is the address of the Gilded Cage, we conclude that "2950r" has reference to the building at the rear thereof and the rental derived therefrom. Income from rental of the Gilded Cage itself is not reported - petitioner's general statements to the contrary notwithstanding. Respondent is sustained as to this issue. The next question is whether petitioner's income for 1950 was understated by his failure to report the sale in that year of a portion of the ending inventory of gin and whiskey of the Gilded Cage. Petitioner admits having received $2,441.47 in 1950 in payment for the inventory in controversy and that it was not reported. Petitioner contends, however, that his income was not thereby understated since a portion of the amount received went directly to pay a bill for whiskey and gin which was outstanding and the remaining portion was credited to Steak House purchases. The facts found on this record fully substantiate petitioner's position. Therefore, as to this point, respondent is reversed. *174 Respondent determined that petitioner did not report three items of interest income received by him in the year 1951 - specifically, $35.40 paid on his savings account, $225 paid on notes given by the purchasers of the Gilded Cage, and $36.83 received on the sale of the Ingleside lots. The record made herein is completely devoid of any probative evidence showing respondent's determination to be in error. The burden of proof as to this item lay with petitioner. Respondent's determination is, therefore, sustained. The next question is whether petitioner overstated his wage deductions for each of the years 1948 through 1951. In this connection, it is respondent's position that such deductions were overstated by the amounts $1,231.29, $1,209, $629.75, and $419.41, respectively, by reason of petitioner's claiming the deduction of sums allegedly paid Harry Gilbert. Petitioner admits, and the facts found herein show, that no wages were actually paid Gilbert; that Gilbert was placed upon the payroll of the Steak House and checks issued to him, which checks were endorsed and returned to the Steak House, as a part of a scheme to make possible Gilbert's qualifying for social security and *175 State insurance. Yet, petitioner would have us believe that he did not actually receive the benefit of a deduction therefor, since the gross receipts of the Steak House were correspondingly increased or an item of expense so decreased. As to this item, Briley testified that these same checks came back to him as an overage in cash. Moreover, petitioner's accountant was not informed of this practice until some time in 1950 or 1951. The most that can be said is that apparently such compensating entries were occasionally made when it suited petitioner to have them made. Certainly, if such entries had in fact been made consistently throughout the years involved, that fact is susceptible of proof by specific oral testimony and by introduction of specific book entries themselves. National Weeklies, Inc. v. Commissioner, 137 Fed. (2d) 39. We, therefore, sustain respondent on this item. The next point of controversy involves the deductibility of the amount paid by petitioner to his wife, Kaytie, as alleged wages in the years in question. Respondent would disallow such deductions. In the alternative, he urges that the amounts admittedly so paid are at the most deductible only *176 in part, being unreasonable in amount. Petitioner contends that the amounts in dispute were paid for services rendered and are fully deductible as such. The facts pertinent to the question presented are fully set forth in our findings and their recitation here would be superfluous. Suffice it to say, such facts show that, although Kaytie was not listed on the employee time book, reported to no one and kept no regular hours, she did on rush occasions assist the full-time hostess in the seating of guests at the Steak House and rendered other services required of a hostess. In addition, Kaytie was responsible for the design and color scheme carried out in the Steak House. Thus, she may be said to have rendered some services for which she could properly draw wages. But, the only evidence in the record bearing upon what would constitute a reasonable wage for such services is the negative evidence that the full-time hostess drew substantially less than did Kaytie. Therefore, doing the best we can with the evidence at hand and bearing in mind all mitigating circumstances, we have concluded, and, accordingly hold, that of the amounts paid Kaytie by petitioner during each of the taxable years *177 the sum of $1,000 as to each year is properly deductible as wages. Cohan v. Commissioner, supra. The next question presented is whether petitioner incurred an abandonment loss in 1949 upon the disposition of a shuffleboard. In his determination, respondent disallowed a claim for such abandonment in the amount of $722.63. The evidence adduced as to the shuffleboard in controversy shows that it was not actually abandoned but was given to a friend for hauling it away. That it was neither useless and past repair, as claimed by petitioner, nor had reached the end of its useful life, is evidenced by the fact that the shuffleboard was subsequently given to the YMCA where it was, and for aught that appears, apparently is still in use. Respondent's action with respect to this item is approved. The next question is whether petitioner is to be allowed a claimed deduction $600of for alleged promotion expenses in each of the years 1949 and 1950. As to this item, the evidence is inadequate to prove the deductions claimed. The next issue involves petitioner's claimed deduction in each of the years 1949 through 1951 in the amount of $6,536.22 for interest expense on a proposed *178 tax deficiency for the years 1940 through 1946. Respondent would disallow such deduction on grounds that petitioner did not actually incur interest expenses. It is petitioner's position that, irrespective of whether such interest was paid, it accrued during the years in question and therefore was deductible. We do not agree. Petitioner's books and records were not maintained on a true accrual basis of accounting. Rather, a hybrid system was used. That is to say, petitioner's system of accounting was based upon the cash receipts and disbursements method except as to the use of inventories. While the use of inventories makes mandatory the use of the accrual method, see Regulations 111, Sec. 29.41-2, the fact remains that the use of inventories will not necessarily establish a hybrid system as an accrual system. See Elsie SoRelle, 22 T.C. 459. But even if this were not true, petitioner's tax liability for they years 1940 through 1946 was in dispute and was being contested. In fact, it was not until some time after the years with which we are concerned that such liability was finally settled. As we said in H. E. Harman Coal Corporation, 16 T.C. 787, modified *179 without discussion of this point, 200 Fed. (2d) 415, at pages 806-807: "* * * the rule of the Anderson case [269 U.S. 422] requires that in order for a tax to be accrued, all the events which fix the amount of that tax and the liability to pay it must have happened. This rule is also applicable to the accrual of an item of interest. Thus for deduction purposes, interest on contested taxes accrues in the year in which the liability for such taxes is determined. * * *" The foregoing applies here. The deductions in dispute were improperly claimed and are, therefore, disallowed. The next item in dispute is the proper tax treatment to be accorded the expenses incurred by petitioner in 1949 in moving a dwelling house from which he derived rental income from one location to another. Petitioner claims an expense deduction. Respondent classifies such item as a capital expenditure, and, therefore, not deductible. The question presented has long been settled adversely to *180 petitioner's contention. The cost of moving a building from one place to another constitutes a capital expenditure - not a deductible expense. John G. Bullock, 27 B.T.A. 440, affd. sub nom., Winnett v. Helvering, 68 Fed. (2d) 614. Respondent's disallowance of the claimed deduction is, accordingly, approved. Petitioner also claims as an expense deduction the cost of installing new carpeting and the cost of an additional room at the Steak House in 1950. With respect to this item, petitioner asserts that the original construction failed to gain the approval of the building inspector; that he was compelled to tear down and reopen portions of the work done and make repairs to effect compliance with building regulations. It is, therefore, petitioner's theory that he should be allowed to deduct as expense the portion of the cost attributable to the demolition and conforming repairs. From the evidence it appears that both the installation of new carpeting and the addition of *181 an extra room were permanent improvements with useful lives of longer than one year. This being true, the cost so incurred, including the expense of correcting any errors in construction, constitute a capital expenditure, and as such, are not deductible. Driscoll v. Commissioner, 147 Fed. (2d) 493. We, accordingly, so hold. The next item in dispute is whether petitioner sustained a deductible loss in 1948 incident to the widening and paving of the street in front of the Gilded Cage. Respondent has disallowed, as unsubstantiated, the deduction of $1,761.84 claimed therefor by petitioner. We have found that the amount so claimed represents approximately two-thirds of the $2,388 cost to petitioner of the original pavement and landscaping put in by him. However, the record fails to reveal whether any depreciation was taken on such improvements; specifically, what portion thereof was taken by the city; whether property values were enhanced by the new street; and finally, the specific amount petitioner was assessed for the new street. All of these factors are necessary in determining the amount of loss, if any, that was actually sustained by petitioner. The burden of *182 proof as to this item rested upon petitioner and he has failed to carry it. Respondent's determination is sustained. The next question is whether the deduction for depreciation claimed by petitioner in each of the years 1949 through 1951 was excessive in amount. Respondent maintains that such deduction was excessive in the amounts of $64.90, $1,057.71 and $1,498.65, respectively, and that the total depreciation properly allowable for these years does not exceed $1,425.59, $8,165.42, and $9,733.44, respectively. Petitioner has testified and now argues on brief that his income tax returns for each of the years involved were prepared by his certified public accountant; that his accountant determined the correct basis and rates to be used for depreciation; that the amounts so determined were those claimed on his returns; and that they were the correct and proper amounts to be allowed. Such evidence falls short of providing us a satisfactory basis for making an independent determination, or even an estimate, of the depreciation properly allowable. This being true, we have no alternative to approving those depreciation allowances advocated by respondent. The next question involves *183 the propriety of the amount claimed as a deduction by petitioner for legal expenses in 1951. Of the total legal expense deduction so claimed, respondent has disallowed $5,000. The amount so disallowed represents the credit given petitioner in December, 1951, by his attorney on account of legal services rendered, or to be rendered, as part consideration for petitioner's half interest in the Paddock. Pursuant to the agreement entered into by petitioner and his attorney, the transfer of the interest involved was to take place at the end of the 1952 racing season. As we view the evidence bearing upon this point, the disputed deduction is properly to be disallowed irrespective of whether we agree with respondent's contention that the sum in question may not be considered as having been constructively received, and so paid, until the actual transfer was consummated. As pointed out by respondent, the facts show that some of the legal services involved were rendered in connection with personal matters entirely unrelated to petitioner's position. No segregation of the legal services as between personal and business matters has been offered. In fact it is admitted that any such allocation *184 is impossible. Thus, the record made affords no justification for an approximation of what part, if any, of the $5,000 is properly deductible as a business expense. Burnet v. Houston, 283 U.S. 223. Accordingly, respondent's action with respect to this item is affirmed. Among the adjustments made by respondent in his determination for the year 1951 are elimination from income for that year of the long term capital gain realized by petitioner upon the sale of his partnership interest in the Paddock and the disallowance of a loss deduction claimed on the sale of an automobile in 1951. Petitioner has offered no evidence to controvert the propriety of either adjustment. Such adjustments are therefore approved. The next issue involves the question of whether petitioner is entitled to an interest deduction for the amount of $354.17 paid in 1949 upon the acquisition of certain realty. With respect to this item, the facts show that at the time of his purchase of the Ingleside lots, petitioner paid the above amount for accrued interest which was due and owing. While it is not altogether clear, it appears that the amount in question was the obligation of petitioner's grantor. *185 This being true, it was not an interest obligation of petitioner; it was paid by petitioner as a part of the cost basis, not as interest as such; and it is, therefore, not deductible. Rodney, Inc., 2 T.C. 1020, affd. 145 Fed. (2d) 692; Commissioner v. Breyer, Jr., 151 Fed. (2d) 267, affirming memorandum opinion of this court [3 TCM 48,]. Pratt-Mallory Co., Inc. v. United States, 82 Ct. Cl. 292, 12 Fed. Supp. 1020. Cf. Pancoast Hotel, 2 T.C. 362; Elk Discount Corporation, 4 T.C. 196. The next item is whether petitioner is entitled to a deduction for real estate tax for 1949. Respondent has determined that the amount of $1,317.24 so claimed by petitioner for 1949 is unallowable. The facts which we have found indicate that petitioner paid the foregoing amount to redeem his residence from Hicks. While not altogether clear in the record, Hicks had undoubtedly acquired the residence in a tax sale and petitioner was exercising the right of redemption accorded him under Arizona law. See Arizona Code, annotated, 1939, section 73-823. That payment was made by petitioner to Hicks rather *186 than to proper governmental authority would seem to be of no significance. The fact remains that petitioner made such payment in satisfaction of a tax obligation for which under local law he remained personally liable. See Conway v. Mosher, 55 Ariz. 307, 101 P. 2d 209. Such personal liability is determinative of deductibility. Magruder v. Supplee, 316 U.S. 394; John Randolph Hopkins, 15 T.C. 160. This being true, we, accordingly, hold that petitioner is entitled to the deduction sought. The next question is whether petitioner is entitled to dependency credits for his mother and his stepfather in the year 1948, as provided in section 25(b) of the Internal Revenue Code of 1939, the pertinent portions of which are set out below. [3]
*187 Petitioner claimed the credits in controversy only on his 1948 return. Respondent would disallow such credits on grounds that petitioner did not contribute more than on-ehalf of the support of either his mother or his stepfather. The facts found on this record show that in February, 1948, petitioner gave his mother $1,000 to be used for living expenses of her and his stepfather. However, there has been no showing made as to the total cost of such support nor that one-half of that cost was received from petitioner, as required by section 25(b)(3), supra. Cf. Lena Hahn, 22 T.C. 212. The dependency credits sought are, therefore, disallowed. The next question is whether the addition to tax for substantial underestimation of estimated tax pursuant to section 294(d)(2) of the 1939 Code, [4] should be imposed for the years 1948, 1949, and 1951 as asserted by respondent. *188 If, as a result of the holding herein, it appears on the rule 50 recomputation that petitioner did in fact underestimate his estimated tax in any of the years mentioned within the meaning of the cited statute, then and in that event the prescribed addition to tax will be imposed for any such years. There remains the question of fraud. As to this question, the burden is upon respondent to establish that some part of the deficiency in each year was caused by an intention to defraud the government of taxes legally due. The existence of such an intent is never to be presumed. The evidence thereof must be clear and convincing. Moreover, involving as it does the taxpayer's frame of mind, seldom can one act or omission be singled out as evidencing a fraudulent intent. Rather, such intent is usually to be found by surveying the taxpayer's whole course of conduct. Thus, whether a fraudulent intention is harbored by a taxpayer at any specific time is a fact to be adduced as any other fact, from all the evidence of record and inferences properly to be drawn therefrom. Charles E. Mitchell, 32 B.T.A. 1093, *189 affirmed sub nom. Helvering v. Mitchell, 303 U.S. 391. If after a thorough study of the entire record, with due consideration for the inferences, there abides a conviction based upon clear and convincing evidence that any part of the deficiency determined by respondent for each year involved was due to a fraudulent intent to evade tax, then and only then is the socalled fraud penalty provided in section 293 (b) of the 1939 Code [5] properly to be imposed for such year. The record made in the instant case is replete with evidence of petitioner's fraudulent intent in each of the years before us. The purported formation of the alleged partnership between petitioner and Briley in years prior to the taxable years *190 was in its inception fraudulent per se. The continuance of the myth in 1948 constitutes direct evidence of fraud in that year. Moreover, in each of the years in question a portion of the receipts of the Steak House and Gilded Cage, in sizeable amounts, were not recorded on the cash register tapes, on the books of account maintained by petitioner, were not reflected in his bank deposits, nor reported on his tax returns. Such a course of action in the premises here existing clearly evidences a fraudulent intent on the part of petitioner to evade his proper taxes. Further, we have found that in each of the taxable years, petitioner derived income from gambling or related activities that was not recorded in his books of account nor reported. Although failure to report income sometimes alone may be insufficient to establish fraud, James Nicholson, 32 B.T.A. 977; L. Glenn Switzer, 20 T.C. 759, the repeated and consistent practice throughout the years involved of failing to report gains derived from this source, some of which gains were also fraudulent, per se is further *191 strong and congent evidence of an intent to evade tax. After a thorough study of the long record herein, we are convinced and, therefore, have found as a fact that some part of the deficiency in each of the years before us was due to fraud with intent to evade tax. Accordingly, we here so hold Decision will be entered under Rule 50. Footnotes
1. In his bill of particulars, respondent sets forth $12,566.71, as the amount of unsubstantiated gambling losses disallowed. The $11,066.71 appearing above is the aggregate of the losses appearing in petitioner's gambling account and the figure used in preparation of his 1950 tax return.↩
2. It is to be noted that the amount of losses recorded in petitioner's gambling account and claimed by petitioner in computing the gain reported from this source for 1950 is the sum of $11,066.71. Respondent in his bill of particulars and on brief apparently seeks to disallow as unsubstantiated gambling losses of $12,566.71, or $1,500 more than was originally claimed by petitioner. The discrepancy remains unexplained.↩
3. SEC. 25. CREDITS OF INDIVIDUAL AGAINST NET INCOME. * * *
(b) Credits for Both Normal Tax and Surtax. - (1) Credits. - There shall be allowed for the purposes of both the normal tax and the surtax, the following credits against net income: * * *
(D) An exemption of $600 for each dependent whose gross income for the calendar year in which the taxable year of the taxpayer begins is less than $500, except that the exemption shall not be allowed in respect of a dependent who has made a joint return with his spouse under section 51 for the taxable year beginning in such calendar year. * * *
(3) Definition of Dependent. - As used in this chapter the term "dependent" means any of the following persons over half of whose support, for the calendar year in which the taxable year of the taxpayer begins, was received from the taxpayer: * * *
(D) the * * * mother of the taxpayer, * * * (E) a stepfather * * * of the taxpayer,↩
4. SEC. 294. ADDITIONS TO THE TAX IN CASE OF NONPAYMENT. * * *
(d) Estimated Tax. - * * *
(2) Substantial Underestimate of Estimated Tax. - If 80 per centum of the tax (determined without regard to the credits under sections 32 and 35↩), in the case of individuals other than farmers * * * exceeds the estimated tax (increased by such credits), there shall be added to the tax an amount equal to such excess, or equal to 6 per centum of the amount by which such tax so determined exceeds the estimated tax so increased, whichever is the lesser. * * *.
5. SEC. 293. ADDITIONS TO THE TAX IN CASE OF DEFICIENCY. * * *
(b) Fraud. - If any part of any deficiency is due to fraud with intent to evade tax, then 50 per centum of the total amount of the deficiency (in addition to such deficiency) shall be so assessed, collected, and paid, in lieu of the 50 per centum addition to the tax provided in section 3612(d)(2)↩.